**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CARA BOWN, | ) | CASE NO. 1:25-CV-00241-JDA |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL |
| v. | ) | ARMSTRONG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY ADMINISTRATION, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.      INTRODUCTION

Plaintiff Cara Bown ("Ms. Bown") seeks judicial review of the final decision of the Commissioner of Social Security denying her application for a period of disability ("POD") and disability insurance benefits ("DIB"). The parties have consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 4). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## II.     PROCEDURAL HISTORY

On December 3, 2020, Ms. Bown filed her application for POD and DIB, alleging an onset date of January 1, 2013. (Tr. 197). Ms. Bown's application related to her anxiety, depression, and fibromyalgia. (Tr. 219).

The Social Security Administration ("SSA") denied Ms. Bown's application initially and upon reconsideration. (Tr. 92, 96). Ms. Bown requested a hearing before an administrative law judge ("ALJ"). (Tr. 123). The ALJ held a hearing on September 13, 2023, at which Ms. Bown was represented by counsel. (Tr. 34). Ms. Bown testified, as did an independent vocational expert

1

("VE"). On January 24, 2024, the ALJ issued a written decision, finding that Ms. Bown was not disabled. (Tr. 14). The ALJ's decision became final on November 19, 2024, when the Appeals Council declined further review. (Tr. 1).

On February 7, 2025, Ms. Bown filed her Complaint, challenging the Commissioner's final decision. (ECF No. 1). Ms. Bown asserts the following assignments of error:

(1)    The administrative law judge's ("ALJ") assessment of Plaintiff's credibility is not supported by substantial evidence.

(2)    The administrative law judge's ("ALJ") evaluation of Plaintiff's non-exertional mental limitations is [not] supported by substantial evidence.

(ECF No. 7, PageID # 1739, 1747).

## III.    BACKGROUND[1]

### A.    <u>Personal, Educational, and Vocational Experience</u>

Ms. Bown was born in 1973 and was 43 years old on her date last insured. (Tr. 26, 197). She has a high school diploma and attended some college. (Tr. 220). She is married and has no children. (Tr. 197-98). Ms. Bown has prior work experience as a graphic designer. (Tr. 70, 220).

### B.    <u>Relevant Hearing Testimony</u>

#### 1.    *Ms. Bown's Testimony*

Ms. Bown testified that she began attending an intensive outpatient program ("IOP") in January 2017. (Tr. 45). She testified that, prior to beginning the program, she was experiencing manic episodes, followed by crashes. *Id*. She also testified that her medications were not working well at that time. *Id*. She further testified that she was suffering from insomnia and that she was drinking alcohol to self-medicate. (Tr. 46).

Ms. Bown testified that, at least once per month, she would experience periods of extreme

---

[1] The ALJ found that Ms. Bown suffered from both physical and mental impairments. In this proceeding, Ms. Bown challenges only the ALJ's treatment of her mental impairments. Accordingly, I will limit my discussion to evidence regarding those impairments.

anxiety, sometimes followed by periods where she would sleep for up to 24 hours. (Tr. 50-51). Ms. Bown further testified that she eventually experienced a period of paranoia, which resulted in her not wanting to leave the house. (Tr. 53). She also testified that, during her low periods, she would have difficulty getting out of bed and doing household chores. (Tr. 54).

Ms. Bown testified that she relies on her husband to assist with chores and household tasks, including grocery shopping and paying the bills. (Tr. 58-59). She also testified that she is responsible for taking care of the dogs and for unloading the dishwasher. (Tr. 59). She testified that, during the relevant period, she would stay at home during the day while her husband went to work. (Tr. 66). She also testified that she did not attend social functions. (Tr. 60). She testified that she used to enjoy sailing and attending the regatta, but that she stopped showing up in light of her mental health issues. *Id*. She testified that she would go sailing with her father approximately once per month between 2014 and 2017. (Tr. 66). She also testified that she was drinking roughly half bottle of wine per night. *Id*.

### 2. *Vocational Expert's Testimony*

The ALJ asked the VE to consider a hypothetical individual with Ms. Bown's age, education, and work history who could work at all exertional levels; was limited to simple, routine, and repetitive tasks in a static work environment with few changes in a routine work setting and with those changes explained in advance; could only engage in occasional interaction with coworkers and occasional and superficial interaction with the public; could not perform at a production rate pace but could perform goal-oriented work; could not engage in arbitration, negotiation, or confrontation; and could not be responsible for the safety of others or direct the work of others. (Tr. 70-71). The VE testified that the hypothetical individual could not perform Ms. Bown's past work but could perform work as a linen room attendant, laundry worker, or box bender or maker. (Tr. 71-72).

The ALJ next asked the VE if the hypothetical individual could still perform jobs existing in significant numbers in the national economy if the hypothetical individual were limited to work at the light exertional level. (Tr. 72). The VE testified that the hypothetical individual could work as a marker, laundry classifier, or garment sorter. *Id*. However, the VE testified that it would be work preclusive if the hypothetical individual required frequent breaks during the day, would be off task 20% of the day, or would be absent more than one day per month, including arriving to work late or leaving early. (Tr. 72-74).

### C.    Relevant Opinion Evidence

#### 1.    *State Agency Psychologists*

On June 17, 2019, Karla Delcour, Ph.D., a state agency psychologist, opined that Ms. Bown had a medically determinable impairment of depressive, bipolar, and related disorders that did not precisely satisfy the diagnostic criteria. (Tr. 79-80). Dr. Delcour further opined that there was insufficient evidence to determine whether Ms. Bown met the Paragraph B or Paragraph C criteria of the listings prior to her date last insured. (Tr. 80). The ALJ found that Dr. Delcour's opinion was partially persuasive. (Tr. 25).

### D.    Relevant Medical Evidence

On April 10, 2013, nine months before the alleged onset date, Ms. Bown presented to Psychological & Behavioral Consultants for an initial psychiatric assessment. (Tr. 1197). Ms. Bown reported experiencing depression and difficulty sleeping. *Id*. She stated that she was seeking a second opinion after receiving treatment for a number of years in Cleveland. *Id*. On examination, Ms. Bown was alert, cooperative, and oriented to time, place, person, and situation, with normal speech, coherent and logical thought processes, normal thought content, a depressed mood, appropriate affect, and fair insight and judgment. (Tr. 1201). She was diagnosed with attention deficit disorder (ADD) and major depressive disorder. (Tr. 1203).

Ms. Bown had a follow-up visit on April 24, 2013. (Tr. 1119). She reported that she had started working more, and that she had seen improvement in her sleep and mood. *Id*. On examination, Ms. Bown was alert, oriented, and cooperative, with good eye contact, normal speech, logical thought processes, a euthymic mood, appropriate affect, and good insight and judgment. *Id*. Ms. Bown had another follow-up visit on June 5, 2013. (Tr. 1115). She reported difficulty sleeping but some improvement in mood. *Id*. Her medications were adjusted. *Id*. On June 26, 2023, Ms. Bown reported difficulty sleeping, decreased energy, and weight changes. (Tr. 1135).

At a follow-up visit on July 24, 2013, Ms. Bown reported that she was sleeping well. (Tr. 1131). She requested an increase in her Vyvanse dosage. *Id*. On examination, Ms. Bown was alert, oriented, and cooperative, with good eye contact, normal speech, coherent and logical thought processes, appropriate affect, an elated mood, fair insight, and good judgment. *Id*. Her Abilify prescription was discontinued, and her Vyvanse dosage was increased. *Id*. On September 25, 2013, Ms. Bown reported anxiety and difficulty sleeping. (Tr. 1129). Her mental status examination did not reveal any abnormal results. *Id*.

 On January 9, 2014, shortly before her alleged onset date, Ms. Bown presented for a medication therapy check. (Tr. 1088). On examination, Ms. Bown displayed poor concentration, fair insight and judgment, mild memory issues, logical thought processes, a spontaneous demeanor, a labile affect, obsessive thought content, severe depression, and moderate to severe anxiety and anhedonia. *Id*. She was diagnosed with bipolar disorder. (Tr. 1089). At a medication therapy check in March 2014, Ms. Bown reported some improvement in her symptoms, though she remained positive for mild depression and moderate anxiety. (Tr. 1330).

Ms. Bown had another medication therapy check on September 4, 2014. (Tr. 1364). On examination, she was oriented to person, place, time, and situation, with good insight and

judgment, normal speech, logical thought processes, a spontaneous demeanor, a congruent affect, and appropriate thought content. *Id*. She did not display depression, anxiety, or anhedonia, and her condition was assessed as stable. *Id*. Ms. Bown reported that she was planning on teaching exercise. *Id*. Her mental health check was again largely normal on November 13, 2024 and February 5, 2015. (Tr. 1356, 1370). At a gynecologic appointment on June 9, 2015, Ms. Bown reported that she worked as a designer and master gardener, and she said that she was a passionate sailor who had participated in numerous races. (Tr. 556).

On October 6, 2015, Ms. Bown reported that things were "pretty good" and that her mood was good. (Tr. 1390). However, she also reported anxiety from the recent loss of her stepfather. *Id*. She stated that she recently went on vacation and that she was reading more. *Id*. She displayed mild anxiety, but her mental status examination was otherwise largely normal, and her condition was assessed as stable. *Id*. On December 7, 2015, Ms. Bown reported that her mood and anxiety were doing well. (Tr. 1386). On June 19, 2015, Ms. Bown was minimally depressed and mildly anxious. (Tr. 1380).

Ms. Bown presented for another medication therapy check on January 22, 2016. (Tr. 1082). She reported that her sleep was fair to good. *Id*. On examination, she displayed good insight, normal speech, logical and rigid thought processes, appropriate thought content, a spontaneous and preoccupied demeanor, a reasonable and congruent affect, mild anxiety, and mild depression. *Id*. Her condition was assessed as stable, and it was noted that she had a positive therapeutic response to medication. *Id*. She was diagnosed with bipolar II disorder with recurrent depression and adult attention deficit hyperactivity disorder (ADHD). (Tr. 1083).

At a follow-up visit on August 19, 2016, Ms. Bown reported that she had experienced a terrible week after losing her parents and her dog. (Tr. 1400). Her mental status examination was largely normal, although Ms. Bown displayed a spontaneous and preoccupied demeanor and mild

anxiety. *Id*. Her dosage of Klonopin was increased to reduce mood changes and depression. (Tr. 1401).

On November 29, 2016, Ms. Bown reported that things were "going okay," but that she felt intermittent sadness. (Tr. 1398). She also reported that she was traveling often. *Id*. On examination, Ms. Bown was tearful and mildly unkempt with a spontaneous demeanor, flat affect, mild depression, moderate anxiety, and a euthymic mood. *Id*. On January 22, 2016, Ms. Bown reported that she was anxious all the time and on the verge of tears. (Tr. 1082). She presented as mildly anxious and depressed with a spontaneous and preoccupied demeanor, but her mental status exam was otherwise normal, and her condition was assessed as stable. *Id*.

On January 6, 2017, Ms. Bown reported that she was not sleeping well and that she was experiencing negative, racing thoughts. (Tr. 1095). On examination, she displayed some difficulty concentrating, a spontaneous and preoccupied demeanor, a resonant and congruent affect, and mild depression and anxiety. *Id*. Her condition was assessed as partially stable, and it was noted that she had a partially positive therapeutic response to medication. *Id*.

On January 10, 2017, Ms. Bown underwent an evaluation for an IOP at University Hospitals. (Tr. 377). Ms. Bown reported that she struggled with mood swings, insomnia, anxiety, and irritability. *Id*. She also reported that she was self-medicating with alcohol. *Id*. Ms. Bown further reported that she drove herself to the hospital on Christmas Eve 2016 but that she was not admitted. *Id*. On examination, Ms. Bown was well-groomed, alert, and cooperative with normal speech, relevant thought content, logical thought processes, some agitation, a labile mood and affect, and good insight and judgment. (Tr. 382). It was noted that she presented with signs and symptoms of bipolar II disorder with alcohol abuse. *Id*. She was enrolled in the IOP. *Id*.

Ms. Bown had an IOP session on January 17, 2017 with John Heather, M.D. (Tr. 309). He agreed with the diagnosis of bipolar disorder. *Id*. It was noted that she had experienced a severe

decline in functioning and an increase in impulsivity and alcohol abuse beginning in December 2016. *Id*. She reported that, prior to December 2016, a nurse practitioner at Psychological & Behavioral Consultants decided to take her off of all her medications except Lamictal. *Id*. On examination, she displayed mild agitation and fidgeting, pressured speech, an irritable and anxious mood, a flight of ideas, and passive suicidal ideation. *Id*. Dr. Heather noted that she was distractable, with ADD-like symptoms partially helped by stimulants. *Id*.

Ms. Bown attended another IOP session on January 30, 2017. (Tr. 307). She reported being in a manic state for much of the previous week and stated that she was not sleeping well due to racing thoughts. *Id*. Ms. Bown also reported that she was benefiting from the IOP. *Id*. She denied alcohol use and stated that she was less argumentative with people, although her anxiety remained high. *Id*. On examination, she displayed mild agitation, rapid speech, an anxious mood, an elevated affect, a flight of ideas, fair insight and judgment, and distractible concentration. (Tr. 308). Dr. Heather stated that Ms. Bown was in a manic state. *Id*.

On February 3, 2017, Ms. Bown had another medication therapy check. (Tr. 1404). She reported recent manic episodes followed by depression along with persistent anxiety. *Id*. She displayed obsessive thoughts and mild anxiety, depression, and anhedonia. *Id*. Her condition was again assessed as stable. *Id*.

Ms. Bown attended an IOP session with her husband on February 21, 2017. (Tr. 305). She reported that she could not sleep without Ambien and Clonazepam. *Id*. Dr. Heather noted that Ms. Bown was demonstrating hypomania during group therapy sessions and that she was "into everyone else's business" and "playing therapist." *Id*. Her husband reported that she had a history of antidepressant-induced mania and binge drinking to help her sleep. *Id*. Her mental status examination was largely normal, but she was mildly elated with rapid speech. (Tr. 306).

Ms. Bown attended another IOP session on March 2, 2017. (Tr. 303). She admitted to

drinking heavily and taking too much Ambien the prior week. *Id*. She also admitted that she was avoiding dealing with her addiction issues in the IOP, often playing therapist and getting into other patients' issues rather than her own. *Id*. She said that she felt like a stupid failure. *Id*. Dr. Heather told Ms. Bown that this felt like their first real session where they were dealing directly with her behaviors. *Id*. Dr. Heather noted that Ms. Bown "definitely" abuses Ambien and alcohol, and stated that her Vyvanse prescription might be more of a crutch for her addiction issues. *Id*. Ms. Bown agreed to abstain from alcohol, but stated that she did not want a referral to Alcoholics Anonymous. *Id*. On examination, she was disheveled, preoccupied, and withdrawn, with psychomotor retardation, slowed speech, a depressed mood, and a restricted affect. (Tr. 304). She was diagnosed with alcohol use disorder, sedative hypnotic dependence, and bipolar I disorder. *Id*. Dr. Heather instructed her to abstain from Ambien and alcohol and to reduce her Clonazepam dosage. *Id*.

On March 4, 2017, Ms. Bown saw Danette Conklin, Ph.D. for a referral from her IOP. (Tr. 316). Ms. Bown reported that she was drinking more frequently at home and using alcohol as a coping tool. *Id*. She displayed a depressed and irritable affect. (Tr. 317). She was diagnosed with bipolar I disorder and alcohol use disorder, mild. *Id*.

Ms. Bown had another IOP session on April 4, 2017. (Tr. 301). Dr. Heather noted that Ms. Bown continued to show evidence of addictive behaviors and to display the consequences of drinking. *Id*. Dr. Heather also noted that Ms. Bown would take too much Klonopin and then use that as a reason to abuse alcohol. *Id*. He advised her that she needed an evaluation for addiction and recovery issues and refused to refill her prescription for Vyvanse. *Id*. On examination, she was disheveled, preoccupied, and withdrawn, with psychomotor retardation, slowed speech, a depressed mood, and a restricted affect. (Tr. 301-02).

On June 30, 2017, after her date last insured, Ms. Bown had another follow-up visit at

Psychological & Behavioral Consultants. (Tr. 1422). She reported that she recently ran out of one of her medications and that she was experiencing mild depression. *Id*. She displayed obsessive thoughts, a spontaneous and preoccupied demeanor, and mild depression, anxiety, and anhedonia. *Id*. Ms. Bown continued to display depression and anxiety on December 1, 2017. (Tr. 1091).

Between March 14, 2018 and November 21, 2018, Ms. Bown received mental health treatment Veronica Baker, CNP. (Tr. 851-915). On May 1, 2018, Ms. Bown was admitted to Highland Springs Hospital for worsening depression and anxiety with passive suicidal ideation. (Tr. 1443). Ms. Bown reported severe daily anxiety with panic attacks three to four times per week. *Id*. Her medications were adjusted during her stay, and she was discharged on May 9, 2018 with an improving condition and a primary diagnosis of major depressive disorder. (Tr. 1440-41). Ms. Bown was again admitted to Highland Springs from July 2, 2018 through July 6, 2018 for severe depression after her husband asked for a separation. (Tr. 1530). She subsequently participated in a partial hospitalization program between July 6, 2018 and July 24, 2018. *Id*.

Ms. Bown also saw Madlyn Bookatz, a licensed professional clinical counselor, beginning in 2010. She submitted a letter from Ms. Bookatz, dated December 12, 2022, stating that the treatment records from the relevant period had been shredded. (Tr. 848). In the letter, Ms. Bookatz stated that Ms. Bown had been "struggling to stabilize" since 2010, and that she was unable to follow through with tasks and stay focused on most of the goals she set for herself. *Id*. Ms. Bookatz also stated that Ms. Bown would constantly get distracted and change her focus. *Id*. She further stated that Ms. Bown's behavior was unpredictable with highs and lows, leading Ms. Bookatz to believe that Ms. Bown had strong bipolar tendencies. *Id*. She also stated that Ms. Bown often canceled appointments on the same day and that counseling subsided when Ms. Bown was unable to keep her appointments. *Id*.

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Bown met the insured status requirements of the Social Security Act through March 31, 2017. (Tr. 19). The ALJ next determined that Ms. Bown had not engaged in substantial gainful activity between January 14, 2014, the alleged onset date, and her date last insured. *Id*. The ALJ further determined that Ms. Bown had the following severe impairments: depression, anxiety, attention deficit hyperactivity disorder, and fibromyalgia. *Id*. However, the ALJ also determined that none of Ms. Bown's severe impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I. (Tr. 19-20).

The ALJ next determined that Ms. Bown had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) except she is limited to frequent handling and fingering. [T]he claimant is limited to a static work environment, tolerating few changes in a routine work setting; however, when said changes do occur, any changes in job duties will need to be explained. She is limited to simple tasks and limited to routine and repetitive tasks. The claimant is limited to occasional interaction with coworkers. She is limited to occasional superficial interaction with the public. By superficial interaction, meaning if a member of the public were to approach and ask directions to the nearest restroom, she would be able to provide such information, but that would be the extent of the interaction. The claimant is not able to perform at a production rate pace (e.g., assembly line work) but can perform goal-oriented work (e.g., office cleaner). She is further limited to work that does not involve any work tasks that require arbitration, negotiation, confrontation, being responsible for safety of others, or directing work of others.

(Tr. 21).

The ALJ further determined that Ms. Bown was unable to perform any past relevant work. (Tr. 26). The ALJ determined, however, that jobs existed in significant numbers in the national economy that Ms. Bown could perform, including work as a marker, laundry classifier, and garment sorter. (Tr. 26-27). Accordingly, the ALJ found that Ms. Bown was not disabled. (Tr. 27).

## V.      LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.  Standard for Disability

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis

despite limitations from her impairments. 20 C.F.R. § 404.1520(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g) and 404.1560(c). *See Abbott*, 905 F.2d at 923.

### C.  <u>Analysis</u>

Ms. Bown asserts two assignments of error. First, she argues that the ALJ erred in formulating her RFC because the ALJ's assessment of her subjective symptom reports under Social Security Ruling ("SSR") 16-3p was not supported by substantial evidence. Second, she argues that substantial evidence does not support the ALJ's RFC with respect to her non-exertional mental health limitations. The Court will address each argument in turn.

### 1.  *SSR 16-3p*

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id*. If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id*. at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id*. at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration,

frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id*. at *7-8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec. Admin*., No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

As noted above, Ms. Bown testified that, during the relevant period between January 2014 and March 2017, she experienced depression, mania, anxiety, insomnia, and paranoia. (Tr. 45-46, 50-51). She also testified that her medications were not working well during this period, and that

she was drinking half a bottle of wine per night to self-medicate. (Tr. 46, 66). She further testified that her symptoms substantially impeded her daily functioning, and that she would have difficulty getting out of bed and doing household chores during her low periods. (Tr. 54).

The ALJ acknowledged Ms. Bown's testimony, but held that her statements were inconsistent with the medical evidence and objective findings. (Tr. 23). Among other things, the ALJ noted that the records from Ms. Bown's medication therapy checks indicate that she presented on multiple occasions with unremarkable mental health symptoms and that she described only mild symptoms of anxiety, depression, and anhedonia from June 2015 to November 2016. *Id*. The ALJ also noted that providers typically characterized Ms. Bown's condition as stable and that she tolerated her medications well. *Id*. The ALJ further noted that, while Ms. Bown went to Laurelwood Hospital on December 24, 2016 due to increased impulsivity and alcohol abuse, she decided after an evaluation that she did not need to participate. *Id*.  The ALJ found that Ms. Bown's treatment was "generally routine and conservative" and that her medication management notes showed mild to no depressive and anxiety symptoms. (Tr. 24). *Id*. The ALJ further found that Ms. Bown's symptoms appeared to be comorbid with her substance abuse, and that her progress in the IOP appeared to plateau as a result of non-compliance with her medications. *Id*.

The ALJ also concluded that Ms. Bown's subjective statements were not consistent with her reported activities of daily living. Among other things, the ALJ noted that Ms. Bown was able to play with and manage her dogs; had a drivers' license; stated in a January 2017 intake record that she enjoyed sailing, gardening, taking ballet classes, making cards or gifts, and painting and drawing; drove rescue dogs to new locations; performed chores around the house; watched television, used the computer, read, and visited neighbors; socialized by phone and computer; used social media; performed freelance work; went sailing; and gardened. (Tr. 22). The ALJ concluded that these reported daily activities were "inconsistent with her complaints of disabling symptoms

16

and limitations." *Id*.

The ALJ's analysis thus considered the evidence of record and the SSR 16-3p factors, including Ms. Bown's daily activities; the duration, frequency, and intensity of her symptoms; that her symptoms appeared to be aggravated by other factors, including her abuse of prescription drugs and alcohol; her general ability to tolerate her medications; and her relatively conservative course of treatment. The ALJ's analysis was sufficient to satisfy SSR 16-3p. *See Young v. Comm'r of Soc. Sec. Admin.*, No. 5:21-cv-00761, 2022 WL 17546359, at *6 (N.D. Ohio Dec. 9, 2022) (holding that ALJ complied with SSR 16-3p where ALJ evaluated the intensity and persistence of claimant's symptoms and determined extent to which those symptoms limited claimant's ability to perform work activities); *Myers v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-02381-SL, 2022 WL 18636593, at *10-11 (N.D. Ohio Dec. 2, 2022), *report and recommendation adopted*, 2023 WL 369435 (N.D. Ohio Jan. 24, 2023) (holding that ALJ complied with SSR 16-3p where ALJ considered claimant's subjective complaints of pain but did not find pain disabling).

Moreover, while Ms. Bown points to evidence in the record that she believes should have supported a different result, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision").

Finally, Ms. Bown argues that her daily activities, standing alone, do not demonstrate that she is not disabled and do not equate to full-time employment. However, the ALJ did not rely exclusively on Ms. Bown's reports of daily activities. Instead, the ALJ discussed those activities

in conjunction with the objective medical evidence. It was proper for the ALJ to do so. *See Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1006 (6th Cir. 2025) (holding that ALJ did not err in relying on claimant's activities of daily living where the ALJ "carefully analyzed the entirety of the record evidence regarding [claimant's] ability to function, using [claimant's] statements regarding her activities only as one factor among many"); *Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-01290-CEH, 2022 WL 2176539, at *8-9 (N.D. Ohio June 16, 2022) (holding that ALJ did not err in relying on claimant's reports of daily activities in conjunction with objective medical evidence). Ms. Bown's first assignment of error is not well-taken.

### 2.    *Ms. Bown's RFC*

Ms. Bown also argues that the ALJ erred when formulating her RFC because the ALJ did not provide a reasoned and logical bridge between the medical evidence and the RFC with respect to Ms. Bown's mental impairments.

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Golden*, 2018 WL 7079506 at *17. However, "[i]t is plaintiff's burden to prove the severity of her impairments, and to provide evidence establishing her RFC." *Lumpkin v. Comm'r of Soc. Sec.*, No. 1:20-CV-1849, 2021 WL 4987607, at *3 (N.D. Ohio Oct. 27, 2021).

Here, the ALJ determined that Ms. Bown had the residual functional capacity to perform

light work with additional limitations regarding her ability to tolerate changes, interact with coworkers and the public, work at a production rate pace, engage in arbitration, negotiation, confrontation, and direct the work of others. (Tr. 21). Ms. Bown argues that substantial evidence does not support the ALJ's RFC because the ALJ only cited evidence supporting his RFC finding and overlooked contrary evidence.

Ms. Bown's argument fails for two reasons. As an initial matter, courts in this Circuit are generally skeptical of arguments that an ALJ "cherry picked" the record for evidence supporting the ALJ's conclusion. As the Sixth Circuit has stated, "claims that the ALJ 'cherry-picked' the record are 'seldom successful' because they essentially amount to a request that the court 're-weigh record evidence,' which [a court] may not do." *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 971 (6th Cir. 2021) (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)); *see also White*, 572 F.3d at 284 (noting that accusations of cherry picking "can be described more neutrally as weighing the evidence").

Regardless, Ms. Bown's argument that the ALJ cited only to evidence supporting his conclusion and mischaracterized the evidence is not accurate. To the contrary, the ALJ specifically referenced Ms. Bown's testimony that she experienced both depressive and manic periods, that her medications exacerbated her condition, that she could not function or manage household chores, and that she used alcohol to fight her anxiety. (Tr. 22). The ALJ further cited medical records showing that Ms. Bown experienced insomnia, poor concentration, severe depression, anxiety, and anhedonia. (Tr. 23). The ALJ also noted that Ms. Bown enrolled in an IOP in January 2017 after struggling with mood swings, insomnia, anxiety, and substance issues. *Id*. However, the ALJ also found that Ms. Bown often described only mild symptoms, that her condition was generally described as stable, and that she was tolerating her medication well. *Id*.

Thus, the ALJ discussed both positive and negative evidence regarding Ms. Bown's mental

health impairments, concluding that those impairments placed limitations on her ability to work, but that they were not so severe as to render her disabled. Ms. Bown believes that the ALJ should have relied more heavily on evidence supporting her position and that the ALJ should have adopted a more restrictive RFC. As noted above, however, the Court may not overturn the ALJ's decision merely because evidence in the record would have supported a different conclusion so long as the ALJ's decision is supported by substantial evidence. *Jones*, 336 F.3d at 477. Substantial evidence supports the ALJ's RFC here.

Ms. Bown also argues that it was "dishonest" for the ALJ to find that her symptoms were comorbid with her abuse of alcohol and prescription medication, arguing that she instead had a dual diagnosis of substance abuse and mental health issues.[2] Plaintiff does not dispute, however, that Dr. Heather expressly noted that Ms. Bown displayed signs of substance abuse, that she needed a referral for addiction issues, and that she was attempting to avoid dealing with her substance abuse issues in the IOP. (Tr. 303). Even assuming the ALJ should have described Ms. Bown's substance abuse as a "dual diagnosis" with her mental health conditions rather than a comorbid condition, Ms. Bown has not shown that difference in terminology warrants remand. Ms. Bown's second assignment of error is without merit.

## VI.    CONCLUSION

For the foregoing reasons, the Court AFFIRMS the Commissioner's final decision.

**IT IS SO ORDERED.**

Dated: September 30, 2025

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

---

[2] In her merits brief, Ms. Bown refers to the ALJ's reasoning as both "dishonest," "duplicitous," and "mendacious." While counsel must zealously advocate for their client, such language is not acceptable, whether referring to the ALJ, an opposing party, or the Court. Counsel is admonished to refrain from using such language in the future.